**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| OFFICIAL INTELLIGENCE PTY LTD., Individually and on Behalf of all Others Similarly Situated, ) ) ) ) | Case No. ___1:23-cv-2789___ |
| ) | CLASS ACTION |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933 |
| v. ) ) | DEMAND FOR JURY TRIAL |
| BLOCK, INC., JACK DORSEY, and JIM MCKELVEY, ) ) ) | |
| Defendants. ) ) | |

Plaintiff Official Intelligence Pty Ltd. ("Plaintiff"), on behalf of all other similarly situated persons (defined below as the "Class"), by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of: U.S. Securities and Exchange Commission ("SEC") filings of Block, Inc. f/k/a Square, Inc. ("Block" or the "Company"); Australian Securities and Investments Commission ("ASIC") filings of Afterpay Limited ("Afterpay"); court filings made In the Matter of Afterpay Limited [2021] (N.S.W.S. Ct.); press releases issued by Afterpay and Block; analyst reports; media reports; and, other publicly available reports and information. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action asserting claims arising under the Securities Act of 1933 (the "Securities Act") with respect to Defendants' offering and soliciting Afterpay shareholders to purchase Block's Class A common stock ("Common Stock") or CHESS

Depositary Interests ("CDIs" and together with the Common Stock, the "Block Securities") in connection with the Company's January 31, 2022, acquisition of Afterpay (the "Transaction").

2.     On April 4, 2022, Block disclosed for the first time that a material data breach compromising the personal private data of millions of the Company's customers had taken place on December 10, 2021, *i.e.*, prior to the closing of the Transaction, reflecting that the Company maintained an inadequate system of internal controls and causing the price of the Block Securities to fall precipitously, thereby damaging Plaintiff and other members of the Class.  Subsequent disclosures confirmed that the Company maintained an inadequate system of internal control which had helped drive Block's reported rapid growth prior to the Transaction, causing a further material decline in the price of Block Securities.

3.     Plaintiff is bringing this action to recover damages for itself and a class consisting of Afterpay shareholders who acquired Block Securities and were damaged thereby.

## JURISDICTION AND VENUE

4.     The claims alleged herein arise under the laws of the United States, specifically §§12(a)(2) and 15 of the Securities Act, 15 U.S.C. §§77l(a)(2) and 77o, providing this Court with original subject matter jurisdiction pursuant to 15 U.S.C. §77v(a) and 28 U.S.C. §1331.  In addition, the Company's bylaws designate the federal district courts of the United States as the exclusive forum for causes of action arising under the Securities Act.

5.     This Court has personal jurisdiction over each of the Defendants and venue properly lies in this District because at all relevant times Defendants transacted business and otherwise resided in this District.

## PARTIES

6.     Plaintiff acquired Block CDIs in the Transaction in exchange for Afterpay Shares it previously owned.

7.     Defendant Block, known as Square Inc. before December 10, 2021, is a global technology company with a focus on financial services, including Square, Cash App Investing LLC ("Cash App"), Spiral, and TIDAL based in San Francisco, California.  Block's subsidiaries include Lanai (AU) 2 Pty Ltd ("Merger Sub") which was created to facilitate the Transaction.  Its Class A common stock trades under the ticker symbol "SQ" on the New York Stock Exchange. For the sake of consistency, all references to Square, Inc. have been changed to refer to Block.

8.     Defendant Jack Dorsey ("Dorsey"), Block's co-founder, has served as its principal executive officer and a member of its board of directors (the "Board") since July 2009.  Dorsey served as Chief Executive Officer ("CEO") and President from July 2009 until his title changed to "Block Head" as of April 2022.  Dorsey was directly involved in negotiating the Transaction and wrote or signed a letter to holders of Afterpay shares that was included in Afterpay's Scheme Booklet (the "Scheme Booklet") soliciting Afterpay's shareholders' approval of the Transaction (defined below).

9.     Defendant Jim McKelvey is Block's co-founder and a Board member.

## SUBSTANTIVE ALLEGATIONS

10.     Block focuses on (a) providing e-commerce services to small businesses and (b) its Cash App offering, which lets consumers send money to one another via smartphone, purchase things with a prepaid debit card and invest in bitcoin and slices of individual stocks.  Block's reported growth surged as Block's ecommerce services helped small businesses recover from the COVID-19 pandemic and the Company's CashApp made it easy for individuals to accept and invest stimulus checks and unemployment payments causing Block's Common Stock to rapidly increase in price beginning in late 2020.

11.     Afterpay is a buy now pay later service that allows consumers to make payments for purchases in four instalments—one payment is at the time of a purchase and three other

payments are made two, four, and six weeks later.  Afterpay charges sellers a commission and charges purchasers late fees that can be substantial if payments are missed.  Afterpay helped Block's quest to become a financial technologies super app which could expand access to consumers and drive additional revenue for sellers.

12.     On or about August 2, 2021, after discussing potential collaborations since late 2020, Block and Afterpay, entered into a Scheme Implementation Deed (as amended, the "Deed") providing for Block to acquire all Afterpay ordinary shares ("Afterpay Shares") in exchange for Block Securities pursuant to a court-approved scheme of arrangement under Part 5.1 of Australia's Corporations Act 2001 (Cth) (the "Corporations Act") (the "Scheme"), holders of Afterpay Shares could elect to receive either (a) 0.375 shares of Common Stock ("New Common Stock") or (b) 0.375 CDIs ("New Block CDIs") representing ownership interest in shares of Common Stock issued by Block pursuant to a Deed Poll to be executed by Block and Block Sub in favor of all Afterpay shareholders (the "Deed Poll"), after which Afterpay would become a wholly owned subsidiary of Block Sub and an indirect wholly owned subsidiary of Block.

13.     The Deed states that "[a]t the request of [Block] and [Block] Acquirer, Afterpay intends to propose the Scheme and issue the Scheme Booklet."   The Deed further explains that the Scheme Booklet would include "[Block] Information[,]" defined as "the information regarding [Block] (including in respect of the New [Block] Shares, New [Block] CDIs and the Merged Group) provided by [Block] to Afterpay in writing for inclusion in the Scheme Booklet, being information regarding [Block] required to be included in the Scheme Booklet under [Australia's Corporations Act 2001 (Cth) (the "Corporations Act")], Corporations Regulations or ASIC Regulatory Guide 60."

14.     In the Deed, Block represented and warrantied that "the [Block] Information provided in accordance with this document and included in, or incorporated by reference into, the Scheme Booklet … as at the date of the Scheme Booklet … will not contain any material statement which is misleading or deceptive nor contain any material omission having regard to applicable disclosure requirements and will comply in all material respects with the requirements of the Corporations Act, the Listing Rules and all relevant regulatory guides and other guidelines and requirements of ASIC[.]" (Deed §12.3(h)).

15.     The Deed clarifies, in a section titled "further [Block] Information" that "[Block] must take all reasonable steps to assist Afterpay to implement the Scheme on a basis consistent with this document and as soon as reasonably practicable, and in particular must … ***promptly provide to Afterpay any further or new [Block] Information as may arise after the Scheme Booklet has been sent to Afterpay Shareholders and until the date of the [Special] Meeting as may be necessary to ensure that the [Block] Information contained in the Scheme Booklet is not, having regard to applicable disclosure requirements, false, misleading or deceptive in any material respect (including because of any material omission) and to ensure that there would be no breach of clause 12.3(h) [quoted in ¶14] if it applied as at the date on which the further or new [Block] Information arose[.]***"  Deed §5.3(e) (emphasis added).

16.     Also on August 2, 2021, Block disclosed that it "intend[ed] to file with the [SEC] a registration statement on Form S-4 to register the [Block Securities] to be issued in connection with the transaction (including a prospectus therefor), which will include a proxy statement that will be sent to the shareholders of [Block] seeking their approval of such issuance."

17.     On November 4, 2021, the Supreme Court of New South Wales, approved of Afterpay distributing the Scheme Booklet and convening a special meeting (the "Special Meeting") to obtain the necessary Afterpay shareholder approval of the Scheme.

18.     Block exercised control over the contents of the Scheme Booklet relating to a discussion of Block's business based upon:

(a)     The Deed's recitals acknowledge that "[a]t the request of [Block] and [Merger Sub], Afterpay intends to propose the Scheme and issue the Scheme Booklet."

(b)     The term "Regulator's Draft" is defined to mean "the draft of the Scheme Booklet in a form acceptable to both parties which is provided to ASIC for approval pursuant to section 411(2) of the Corporations Act."

(c)     Afterpay was obliged to "consult with [Block] as to the content and presentation of … the Scheme Booklet[.]"

(d)     Section 5.6 of the Deed gives Block the ultimate authority over the form and content of the Block Information presented in the Scheme Booklet.

19.     On or about November 5, 2021, the Scheme Booklet was mailed and emailed to Afterpay's shareholders and, *inter alia*, stated (on page CVii) that "[Block] has provided and is responsible for the [Block] Information" and Section 10.10 of the Scheme Booklet explains that Block had given, and not withdrawn, its consent to be named in the Scheme Booklet "in the form and context in which [it is] named;" "the inclusion of [its] respective reports or statements noted next to [its] name[] or the references to those reports or statements in the form and context in which they are included in this Scheme Booklet; and the inclusion of other statements in this Scheme Booklet which are based on or referable to other statements made by [it] in the form and context in which they are included[.]"

20.    The Scheme Booklet prominently featured the following letter (on p.9) from Dorsey to Afterpay's shareholders:

**Dear Afterpay Shareholder,**

The Square Board and management are excited to offer you the opportunity to participate in the combination of Square and Afterpay, which will unite two companies aligned in a shared mission of economic empowerment and financial inclusion.

We built our business to make the financial system more fair, accessible, and inclusive, and Afterpay has built a trusted brand aligned with those principles. Together, we can better connect Square's largest ecosystems – Cash App and Seller – to deliver even more compelling products and services for merchants and consumers and ultimately better serve our customers around the world.

Square is recognised as an industry leader with customers across a diverse range of industries and countries. Businesses use Square to reach buyers online and in person, manage their business, and access financing. Individuals use Cash App to spend, send, store, and invest money. Square owns a majority ownership stake in TIDAL, a global music and entertainment platform that expands Square's purpose of economic empowerment to artists. We also recently launched TBD, a bitcoin focused open-developer platform with the goal of making it easier to create non-custodial, permissionless, and decentralized financial services.

As an Afterpay Shareholder, your vote is important in order to ensure the Scheme is implemented and you have the opportunity to participate in the future growth and performance of the Combined Group. On behalf of the Square Board, we look forward to welcoming you as a shareholder of Square, following the successful closing of this transaction.

Sincerely,

**Jack Dorsey**
President, Chief Executive Officer and Chairman of the Board

21.    The Scheme Booklet in Section 5 included "Information on [Block]" including the following statements:

(a)    Section 5.3[b][vii] stating that:

Square collects and uses a wide variety of information for various purposes in its business, including to help ensure the integrity of its services and to provide features and functionality to its customers. This aspect of Square's business,

including the collection, use, disclosure, and protection of the information it acquires from its own services as well as from third-party sources, is subject to laws and regulations in the United States, the European Union, and elsewhere.

(b)     Section 5.21 (beginning at p.119) titled "Further Information" stating that "[Block] files annual, quarterly and current reports, proxy statements and other information with the SEC.  [Block]'s SEC filings are available to the public at the SEC's website at www.sec.gov or at [Block]'s website…."

22.     Section 7 of the Scheme Booklet addresses "Key Risks" with Section 7.4 listing certain "Risks Associated with the Operations of the Combined Group" and stating, after four pages of small-print risks including that "Square's business is subject to complex and evolving regulations and oversight related to privacy and data protection[,]" that:

> [t]he outline of risks in sections 7.4(g), (h), (i), and (j) is a summary only.  More detailed information in relation to risk factors relating to the business and operations of [Block] can be found in [Block]'s Annual Report on Form 10-K for the year ended 31 December 2020, filed with the SEC on 23 February 2021, and [Block]'s Quarterly Report on Form 10-Q for the quarter ended 30 June 2021, filed with the SEC on 2 August 2021.  [Block]'s SEC filings are available to the public at the SEC's website at www.sec.gov or at [Block]'s website….

23.     Block, in its annual report for the fiscal year ended December 31, 2020, filed with the SEC on Form 10-K on February 23, 2021 (the "2020 Form 10-K") identified, among other things, the following risks factors:

(a)     Block's "business depends on a strong and trusted brand, and any failure to maintain, protect, and enhance our brand would hurt our business" (emphasis removed) and explaining "[a]ny negative publicity about our industry or our company, … our privacy, data protection, and information security practices, litigation, regulatory activity, … and the experience of our customers with our products or services could adversely affect our reputation and the confidence in and use of our products and services. If we do not successfully maintain a strong and trusted brand, our business could be materially and adversely affected."

(b)      "[Block], our sellers, our partners, and others who use our services obtain and process a large amount of sensitive data.  Any real or perceived improper or unauthorized use of, disclosure of, or access to such data could harm our reputation as a trusted brand, as well as have a material and adverse effect on our business" (emphasis removed) and explaining "[i]f … sensitive information is … improperly accessed … we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to litigation, regulatory scrutiny, and investigations."

(c)      "Our business is subject to complex and evolving regulations and oversight related to privacy and data protection" (emphasis removed) and explaining "[a]ny failure … to comply with our privacy, data protection, or information security policies … could cause our customers to reduce their use of our products and services, disrupt our supply chain or third party vendor or developer partnerships, and materially and adversely affect our business."

(d)      "Our products and services may not function as intended due to errors in our software, hardware, and systems, product defects, or due to security breaches or human error in administering these systems, which could materially and adversely affect our business" (emphasis removed) including that "Our software, hardware, systems, and processes may contain undetected errors or vulnerabilities that could have a material adverse effect on our business, particularly to the extent such errors or vulnerabilities are not detected and remedied quickly. We have from time to time found defects in our customer-facing software and hardware, internal systems, and technical integrations with third-party systems, and new errors or vulnerabilities may be introduced in the future. If there are such errors or defects in our software, hardware, or systems, we may face negative publicity, government investigations, and litigation….  Any errors, data leaks, security breaches, disruptions in services, or other performance problems with our products or services caused by external or internal actors could hurt our reputation and damage our customers' businesses….  Additionally, electronic payment, hardware, and software products and services, including ours, have been, and could continue to be in the future, specifically targeted and penetrated or disrupted by hackers and other malicious actors. Because the techniques used to

obtain unauthorized access to data, products, and services and to disable, degrade, or sabotage them change frequently and may be difficult to detect or remediate for long periods of time, we and our customers may be unable to anticipate these techniques or implement adequate preventative measures to stop them. If we or our sellers or other customers are unable to anticipate or prevent these attacks, our sellers' or other customers may be harmed, our reputation could be damaged, and we could incur significant liability."

24.     The Scheme Booklet otherwise relied upon and directed Afterpay shareholders to the Company's SEC filings including in Section 5.8 which addresses Dorsey's employment agreement with Block and that of the Company's Chief Financial Officer, stating that "[f]urther information in relation to the remuneration of [Block]'s executive officers can be found in [Block]'s annual proxy statement, which is on file with the SEC" but continues by adding, in contrast to Section 5.21 and 7.24 of the Scheme Booklet, that "[Block]'s annual proxy statement is not incorporated into this Scheme Booklet."

25.     The Scheme Booklet advised Afterpay shareholders that "[v]oting will take place at the online [Special] Meeting to be held at 10.00am on Monday, 6 December 2021" but that the meeting could be adjourned at that time.

26.     On or about December 2, 2021, Afterpay announced to the Australian Securities Exchange Ltd ("ASX") that all regulatory conditions for the Scheme had been satisfied, other than a condition precedent relating to Bank of Spain approval which was expected to be satisfied in mid-January 2022.

27.     On or about December 6, 2021, the Special Meeting was opened and then adjourned to December 14, 2021.

28.     In a December 7, 2021, court hearing the Australian court approved the distribution of supplementary documents (the "Supplemental Information") to holders of Afterpay Shares and

an adjournment of the Court's hearing to approve the Scheme.  The Court's December 14, 2021, opinion states, among other things, that Afterpay sought "the Court's approval to dispatch supplementary disclosure materials to Afterpay shareholders in advance of the adjourned [Special] Meeting" including information about the conditions of closing and why independent experts believe the share consideration was still fair after a decrease in Block's share price.

29.     On or about December 7, 2021, the Supplemental Information was disseminated to Afterpay shareholders, and no other information or "further [Block] Information" as defined by the Deed was sent to Afterpay's shareholders following the disclosure of December 7, 2021.

30.     On December 10, 2021, a former employee of Block (the "FE") accessed the Company's networks and downloaded certain reports of Cash App that FE accessed as part of their past employment responsibilities.  FE downloaded personally identifiable information ("PII") for approximately 8.2 million Cash App Investing users (the "Data Breach"), including names, Cash App brokerage account numbers, portfolio values, holdings, and certain trading activity evidencing a lack of adequate internal controls over customer's personal data provided to Block.

31.     On December 14, 2021, Afterpay reopened the Special Meeting and its shareholders approved the Scheme without knowing that the Company lacked adequate internal controls and of the Data Breach.

32.     On or about December 17, 2021, Afterpay issued an announcement with ASX disclosing that it had lodged orders made by the Supreme Court of New South Wales with the ASIC, and that as a result the Scheme was legally effective.  Afterpay further disclosed that the Transaction was expected to occur in the first quarter of 2022 after approval by the Bank of Spain.

33.     On or about December 17, 2021, the Australian court, without being informed of

the relevant undisclosed adverse facts, issued an order approving the Scheme.  The Australian

court issued a decision on December 29, 2021 stating in relevant part that:

**Section 3(a)(10) of the Securities Act 1933 (US)**

[]      As Mr Jackman had indicated at the first court hearing, Block will rely on
the Court's approval of the scheme to qualify for an exemption from the registration
requirements of the *Securities Act* 1933 (US) under § 3(a)(10) of that *Act*.  The
operation of that exemption has been noted in earlier case law including *Re Central
Pacific Minerals NL* above at [28]-[34]; *Re Simeon Wines Ltd* (2002) 42 ACSR
454; [2002] SASC 204 at[21]-[26]; and *Re Solution 6 Holdings Ltd* above at [37]-
[45], and, more recently, in *Re Boart Longyear Ltd* (No 2) (2017) 122 ACSR 437;
[2017] NSWSC 1105 and *Re BoartLongyear Ltd* [2021] NSWSC 1269.

[]      The orders I made at the second Court hearing included a notation that
notice was given to this Court regarding Block's reliance on this exemption of a
kind made in earlier cases. I also summarise several aspects of the schemes for this
purpose, adopting Mr Jackman's summary of those matters:

     (a) The proposed amended scheme contemplates the issue of securities
     (being securities in Block (formerly Square) to be issued by Block) to
     Scheme Shareholders as consideration for their relevant Afterpay share;

     (b) Notice of the proposed reliance on the exemption was given to this Court
     prior to the commencement of the second Court hearing (see paragraphs
     107 to 109 of the written submissions for the first Court hearing);

     (c) An independent expert report prepared by Messrs Edwards and Resende
     of Lonergan Edwards & Associates concludes that the amended scheme is
     in the best interests of scheme shareholders, which opinion was confirmed
     in their letter dated 6 December 2021 (Annexure A to the Shareholder
     Letter) and dispatched to Afterpay shareholders pursuant to the
     supplementary disclosure orders and released to the ASX on 7 December
     2021;

     (d) The Court has held this hearing to consider the fairness and
     reasonableness of the amended scheme;

     (e) The second Court hearing was conducted in open court and any Afterpay
     shareholder subject to the amended scheme had standing to appear in
     opposition.  Notice of the second Court hearing was given to Afterpay
     shareholders the subject of the amended scheme, and [by] an advertisement
     in the Australian newspaper on 9 December 2021; and

(f) No Afterpay shareholder the subject of the amended scheme indicated an intention to appear to oppose the amended scheme or has opposed the approval of the amended scheme.

For these reasons, I made the orders sought by Afterpay at the conclusion of the second Court hearing in respect of the scheme.

34.    On January 31, 2022, Block Sub completed its acquisition of all Afterpay Shares and Afterpay became an indirect wholly owned subsidiary of Block.  In connection with the closing of the Transaction, Block issued 113,387,895 New Common Stock, including Common Stock underlying 95,377,954 New Block CDIs.

35.    After markets closed on April 4, 2022, Block filed a Form 8-K current report with the SEC disclosing that the Data Breach occurred by stating that:

On April 4, 2022, Block, Inc. (the "Company") announced that it recently determined that a former employee downloaded certain reports of its subsidiary Cash App Investing LLC ("Cash App Investing") on December 10, 2021 that contained some U.S. customer information. While this employee had regular access to these reports as part of their past job responsibilities, in this instance these reports were accessed without permission after their employment ended.

The information in the reports included full name and brokerage account number (this is the unique identification number associated with a customer's stock activity on Cash App Investing), and for some customers also included brokerage portfolio value, brokerage portfolio holdings and/or stock trading activity for one trading day.

The reports did not include usernames or passwords, Social Security numbers, date of birth, payment card information, addresses, bank account information, or any other personally identifiable information. They also did not include any security code, access code, or password used to access Cash App accounts. Other Cash App products and features (other than stock activity) and customers outside of the United States were not impacted.

Upon discovery, the Company and its outside counsel launched an investigation with the help of a leading forensics firm. Cash App Investing is contacting approximately 8.2 million current and former customers to provide them with information about this incident and sharing resources with them to answer their questions. The Company is also notifying the applicable regulatory authorities and has notified law enforcement.

The Company takes the security of information belonging to its customers very seriously and continues to review and strengthen administrative and technical safeguards to protect the information of its customers. Future costs associated with this incident are difficult to predict. Although the Company has not yet completed its investigation of the incident, based on its preliminary assessment and on the information currently known, the Company does not currently believe the incident will have a material impact on its business, operations, or financial results.

36.     As a result of the disclosure, the price of Common Stock, which had closed at $145.19 per share on April 4, 2022, plummeted, closing at $135.92, $128.77, $125.93, and $123.22 per share on April 5, 6, 7, and 8, respectively.  Similarly, as a result of the disclosure, the price of CDIs, which trade on the ASX and which had closed at AUD 191.44 per share on April 5, 2022, plummeted, closing at AUD 178.27, AUD 170.68, AUD 168.30, and AUD 164.48 per share on April 6, 7, 8 and 9, respectively.

37.     Block later amended the language in the risk factor disclosures relating to the protecting of customer personal data referenced in the Scheme Booklet (*see* ¶23(b), *supra*) acknowledging the materiality of the Data Breach.  Specifically, the risk factor section in its annual report on Form 10-K filed with the SEC on February 23, 2023, stated in relevant part that: "if our … data protection[] or information security measures … are inadequate or are breached or otherwise compromised, and, as a result, there is improper disclosure of or someone obtains unauthorized access to or exfiltrates … sensitive data on our systems … our reputation and business could be damaged.  If the sensitive data or assets are lost or improperly accessed, misused, disclosed, destroyed, or altered or threatened to be improperly accessed, misused, disclosed, destroyed, or altered, we could incur significant financial losses and costs and liability associated with remediation and the implementation of additional security measures and be subject to claims, litigation, regulatory scrutiny, and investigations.  ***For example, in April 2022 we announced that we determined that a former employee downloaded certain reports of our subsidiary Cash App Investing in December 2021 that contained some U.S. customer information without permission***

*after the former employee's employment ended, as disclosed in our Current Report on Form 8-K filed with the SEC on April 4, 2022.  We have incurred costs related to our investigation and response to this incident, and we could incur other losses, costs, and liabilities in connection with such incident.*" (emphasis added).

38.     As Block warned could happen (*see* ¶23, *supra*), negative publicity and litigation quickly followed, including the filing of *Salinas v. Block Inc. et al.*, Case No. 22-cv-4823 (N.D. Cal., filed Aug. 23, 2022), and *Gordon v. Block, Inc. and Cash App Investing, LLC*, No. 22-cv-6787 (N.D. Cal., filed Nov. 2, 2022).

39.     On March 23, 2023, Hindenburg Research published a report titled "Block: How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion."  The Hindenburg Research report was based on dozens of interviews with former employees, partners, and industry experts, extensive review of regulatory and litigation records, and FOIA and public records requests and concluded that "[t]he 'magic' behind Block's business has not been disruptive innovation, but rather the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics."  In short, it concluded that Block "obfuscates" its Cash App service's true user numbers by reporting misleading metrics "filled with fake and duplicate accounts."

40.     Investors took the disclosures contained in the Hindenburg Research report seriously, with the trading price of price Common Stock, which had closed at $72.65 on March 22, 2023, opening at $60.00 per share after disclosure of the Hindenburg Research report before closing at $61.88 on March 23, 2023, and $60.68 on March 24, 2023.  Similarly, the price of CDIs,

which had closed at AUD 108.99 on March 23, 2023, opening at AUD 91.99 per share after disclosure of the Hindenburg Research report before closing at AUD 88.94 on March 24, 2023.

## CLASS ACTION ALLEGATIONS

41.     Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P 23 on behalf of a class (the "Class") consisting of all persons or entities who acquired Block Securities through the Scheme and continued to hold those Block Securities through April 4, 2022.  Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest are excluded from the Class.

42.     The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class because Block issued 113,387,895 New Common Stock pursuant to the Scheme.  Class members may be identified from records maintained by Block, its subsidiaries, or their transfer agents, and such persons may be notified of the pendency of this action by mail, using form of notice customarily used in securities class actions.

43.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act complained of herein.

44.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether Block and Dorsey offered or solicited the sale of Block Securities to Afterpay's shareholders;

(c)     whether the statements made by Block and Dorsey misrepresented or omitted to state material facts in connection with offering or soliciting the purchase of Block Securities by Plaintiff and other Class members;

(d)     whether Dorsey and McKelvey are control persons of Block within the meaning of Section 15 of the Securities Act; and

(e)     to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of Section 12(a)(2) of the Securities Act Against Block and Dorsey

47.     Plaintiff repeats and realleges ¶¶1-46 by reference.

48.     This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77l(a)(2), on behalf of the Class, against Block and Dorsey.

49.     This Cause of Action does not sound in fraud.  Plaintiff does not allege that Defendants had scienter or fraudulent intent, which are not elements of a §12(a)(2) claim.

50.     Section 12(a)(2) of the Securities Act states that "[a]ny person who offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraphs (2) and (14) of subsection (a) of said section), by the use of any means or instruments

of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable, subject to subsection (b), to the person purchasing such security from him…."

51.     New Block CDIs are a security as defined by the Securities Act and are not excepted from Section 12(a)(2).  See 15 U.S.C §§77b(1), 77l(a)(2).  Block's April 28, 2022, proxy statement states that "Shares of our Class A common stock also trade on the Australian Stock Exchange, or ASX, in the form of CDIs. Each CDI represents a beneficial interest in one share of our Class A common stock" and informs CDI holders how to vote their CDIs.

52.     Block offered CDIs and Block Stock by means of the mails, through the Scheme Booklet, which is a prospectus as defined by the Securities Act.  *See* 15 U.S.C §77b(10) (defining a prospectus as a "prospectus, notice, circular, advertisement, letter, or communication, written or by radio or television, which offers any security for sale or confirms the sale of any security."). Neither exception to that definition applies because there is no effective date of a registration statement and no communication identifying where a prospectus may be obtained.  The Scheme Booklet, as supplemented, was mailings that included a letter and other information directly from Block at least confirming, if not explicitly offering, the sale of a security within the meaning of 15 U.S.C §77b(3).

53.     In addition, the written and oral submissions made by Block to the Supreme Court of New South Wales through its counsel, which appeared at each of the hearings and made

submissions to the Court, is a Prospectus as defined by the Securities Act because that is written information that confirms the sale of a security within the meaning of 15 U.S.C §77b(3).

54.     The Scheme Booklet, as supplemented, omits to state material facts necessary in order to make the Block Information, in the light of the circumstances under which they were made, not materially misleading including the failure to maintain a system of internal control adequate to protect the personal data of Block's customers, that the Data Breach had taken place and that, as reflected in the Hindenburg Research report, Block's growth had been facilitated by the Company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics.

55.     By means of the defective Scheme Booklet, as supplemented, Block and Dorsey promoted, solicited, and encouraged Plaintiff and the Class to vote in favor of the Scheme and thereby offered or sold the Block Securities issue to the Class in connection with the Transaction.

56.     The Prospectus contained concealed and failed to disclose material facts, as alleged above.  Defendants Block and Dorsey owed Plaintiff and other members of the Class the duty to make a reasonable and diligent investigation of the statements contained in the Scheme Booklet, as supplemented, to ensure that such statements were true and that there was no omission to state a material fact required to be stated to make the statements contained therein not materially misleading.  Block and Dorsey, in the exercise of reasonable care, should have known of the materialization of risks contained in the Block Information in the Scheme Booklet.

57.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Block Information in the Scheme Booklet at the time Plaintiff acquired Block Securities.

58.     By reason of the conduct alleged herein, Block and Dorsey violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other Class members who received Block Securities pursuant to the offer or solicitation conducted by Defendants names in this Cause of Action sustained damages in connection with their purchases of Block Securities.  Accordingly, Plaintiff and the other members of the Class who hold the Block Securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the Defendants sued herein or otherwise seek an equivalent measure of damages.

## SECOND CAUSE OF ACTION

**For Violation of Section 15 of the Securities Act Against Dorsey and McKelvey**

59.     Plaintiff repeats and realleges ¶¶1-58 by reference.

60.     Dorsey and McKelvey were each control persons of Block by virtue of their positions as directors and/or senior officers of the Company.  Indeed, Dorsey and McKelvey are identified in Block's SEC filings as two of the Company's three non-independent directors (the other non-independent director having joined the Board in connection with the Company's recent acquisition of TIDAL), and Dorsey is its highest ranking officer.

61.     Dorsey and McKelvey each had the ability to influence the policies and management of Block by their voting and dispositive control over Block, and did so.  On November 3, 2021, Block's shareholders overwhelmingly voted in favor of the issuance shares to Afterpay's shareholders in connection with the scheme, with 862,282,663 votes cast for the proposal and 746,647 votes cast against the proposal solicited through a special proxy statement. Dorsey and McKelvey control over 60% of the outstanding voting power of Block's equity classes. As a result, the issuance of Common Stock in the Scheme, which required a quorum of a majority

of the voting power issued and outstanding and a majority of the voting power of the shares of Square common stock present, was impossible without their support.

62.     Dorsey and McKelvey had a financial interest in Block acquiring Afterpay in order to increase the holding value and marketability of their investment.  Defendants Dorsey and McKelvey were each critical to effecting the Scheme, based on their signing or authorization of the signing of the Deed, by voting as directors to acquire Afterpay, by voting their shares in favor of the Block Proxy Statement, and by having otherwise directed through their authority the processes leading to execution of the Scheme.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action and certifying Plaintiff as class representative under Fed. R. Civ. P. 23;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding rescission or a rescissory measure of damages;

D.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  April 3, 2023

    _s/ Jeffrey S. Abraham_
Jeffrey S. Abraham
Michael J. Klein
**ABRAHAM, FRUCHTER &**
    **TWERSKY, LLP**
450 Seventh Avenue, 38th Fl.
New York, New York 10123
Tel:    (212) 279-5050
Fax:    (212) 279-3655
Email: jabraham@aftlaw.com
       mklein@aftlaw.com

**BRONSTEIN, GEWIRTZ &**
    **GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel:    (212) 697-6484
Fax:    (212) 697-7296
Email: peretz@bgandg.com
       eitank@bgandg.com